U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2012 SEP 28 PM 4: 02

CLERK

BY
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

JAMES "JAK" KNELMAN,     )
    )
    Plaintiff,     )
    )
    v.     )     Case No. 5:11-cv-123
    )
MIDDLEBURY COLLEGE, and     )
WILLIAM BEANEY,     )
    )
    Defendants.     )

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
(Doc. 27)

This matter comes before the court on a motion for summary judgment filed by
Defendants Middlebury College ("Middlebury") and William Beaney ("Coach Beaney")
with regard to all counts in Plaintiff James "Jak" Knelman's complaint.[1] (Doc. 27.)
Plaintiff opposes summary judgment, arguing that genuine issues of material fact render
summary judgment inappropriate.

Plaintiff is represented by Joseph W. Anthony, Esq., Mary L. Knoblauch, Esq.,
Kristin B. Heebner, Esq., Robert F. O'Neill, Esq., and Andrew D. Manitsky, Esq.
Defendants are represented by Karen McAndrew, Esq.

I.     **The Undisputed Facts.**

In early 2009, Mr. Knelman applied for admission as an undergraduate at
Middlebury, a liberal arts college located in Middlebury, Vermont and a Division III
member of the National Collegiate Athletic Association (the "NCAA"). Thereafter, Mr.
Knelman contacted Coach Beaney, the coach of Middlebury's hockey team, to inform
him that he was interested in attending Middlebury and playing on its hockey team. Mr.

---

[1] In his complaint, Mr. Knelman alleges breach of contract, breach of the implied covenant of
good faith and fair dealing, breach of fiduciary duty, defamation, and negligent supervision.
(Doc. 1.)

Knelman had previously played in the United States Hockey League ("USHL") for approximately two years and Coach Beaney was enthusiastic about Mr. Knelman's interest. Mr. Knelman was subsequently accepted to Middlebury. He also tried out for and was accepted to Middlebury's varsity hockey team. Because Division III members of the NCAA cannot award athletic scholarships, Mr. Knelman neither received nor expected to receive a scholarship for playing hockey.

In the fall of 2009, Mr. Knelman began attending classes at Middlebury. Throughout the 2009-2010 season, beginning in November 2009 and ending in February 2010, Mr. Knelman played the left back position on Middlebury's varsity hockey team. At several times throughout the season and at his post-season meeting with Coach Beaney in the spring of 2010, Mr. Knelman told Coach Beaney that he would prefer to play forward and thought he would be better for the team in that position. Mr. Knelman was transferred to a forward position at the beginning of the 2010-2011 season, but was once again playing in a back position by December 2010. At some point between late December 2010 and January 12, 2011, Mr. Knelman and Coach Beaney had a meeting to discuss Mr. Knelman's position on the hockey team. Coach Beaney told Mr. Knelman that he wanted him to be a leader on the team's defensive "penalty-kill" unit. The two discussed this position and Mr. Knelman also expressed the desire to play on the team's "power-play-line."

In his deposition, Coach Beaney described Mr. Knelman from the fall of 2009 to January 15, 2011 as a "hard-working player" who was "respectful" to his coach and teammates and not a "discipline problem" for the team. (Doc. 55 at ¶ 1(c).)

In the fall of 2010, Middlebury's Athletics Department began planning an alumni banquet scheduled to take place on January 15, 2011 (the "Banquet"). The Banquet was intended to honor the 1960-1961 Middlebury men's hockey team on the fiftieth anniversary of the team's winning season. The Banquet also served as a fundraiser for the college. Team members' presence at the Banquet was expected. Mr. Knelman had planned to have dinner with his parents the night of January 15, 2011, so approximately one week prior to the Banquet, he informed Coach Beaney of his plans and asked how

2

long the Banquet would last. Although the parties dispute Coach Beaney's exact response, it is undisputed that Coach Beaney estimated that the Banquet would last less than two-and-a-half hours.

On January 15, 2011, Mr. Knelman arrived at the Banquet at 5:30 p.m. for cocktail hour and sat with one teammate and three alumni. After approximately two-and-a-half hours, between 8:00 p.m. and 8:15 p.m., Mr. Knelman excused himself from the table, explaining that his father was waiting outside for him. He then left the Banquet without seeking out or obtaining permission to leave early from Coach Beaney or from one of the team captains. The Banquet ended at approximately 8:30 p.m. to 8:45 p.m. that evening.

On January 17, 2011, the Monday following the Banquet, Coach Beaney called a team meeting, during which he asked if any of the players had left the Banquet early. Mr. Knelman, the sole student to leave early, answered affirmatively. Coach Beaney said that Mr. Knelman's departure from the Banquet was "selfish." (Doc. 55 at ¶ 6.) Later in the meeting, Coach Beaney expressed his frustration with the team's recent performance and asked each player to comment on how the team could improve. When it was Mr. Knelman's turn to speak, however, Coach Beaney directed him to sit down, saying that Mr. Knelman did not deserve the right to speak. Mr. Knelman claims that he felt shocked, humiliated, and intimidated by Coach Beaney's statements.

On the evening of January 17, 2011, Mr. Knelman contacted each of his teammates individually and apologized for leaving the Banquet early. The next morning, Mr. Knelman sought out Coach Beaney and apologized to him. That afternoon, team captain Charles Strauss told Mr. Knelman that he was suspended from the day's practice. On January 19, 2011, Mr. Knelman was informed that he had been suspended from practice for the rest of the week, including two upcoming weekend games. On January 20, 2011, after meeting with Coach Beaney, team captain Bryan Curran confronted Mr. Knelman with the other team captains. Although Mr. Curran had initially been supportive of Mr. Knelman when Mr. Knelman apologized to him on January 17th, by January 20th Mr. Curran's opinion had changed. Mr. Curran referred to Mr. Knelman as "selfish and uncommitted," and said that "people didn't know," but Mr. Curran knew,

3

that Mr. Knelman "was a problem last year about [his] position." (Doc. 55-13 at 189:7-17.)

On January 24, 2011, Coach Beaney met with Mr. Knelman and dismissed him from the hockey team for the remainder of the season. According to Mr. Knelman, Coach Beaney stated that "[y]ou have a lot of things on your plate and I just don't think hockey is a priority." (Doc. 55-2 at ¶ 40.) Mr. Knelman responded that he had come to Middlebury to play hockey. Coach Beaney responded "well, that's not entirely true; the school has a great environmental studies program, that's what you really came for." (Doc. 55 at ¶ 13.) Mr. Knelman then asked whether the dismissal was in fact due to Mr. Knelman's departure from the Banquet. Coach Beaney answered that the Banquet was part of the reason, "but we had problems with you last year throughout, and you're just not committed to this. You weren't happy with your position, you just didn't care." *Id.* At the end of the meeting, Coach Beaney informed Mr. Knelman that he could return for tryouts with the other incoming or returning players the following season.[2]

After the decision, several members of the varsity hockey team met with Coach Beaney to tell him that they wanted Mr. Knelman back on the team. Coach Beaney informed the players at a team meeting that the decision to dismiss Mr. Knelman was final. Coach Beaney stated that whether his decision was right or wrong, "he was sticking with it." *Id.* at ¶ 17(f). While explaining his reasons for dismissing Mr. Knelman from the team, Coach Beaney stated that this was "not an isolated incident." *Id.* at ¶ 38.

On January 25, 2011, Mr. Knelman began meeting with faculty members, seeking redress for his dismissal from the hockey team. Professor Peter Nelson, the chair of the Geography department, suggested a meeting with Mr. Quinn, the Director of Athletics. On January 27, 2011, Mr. Knelman met with Mr. Quinn, Professor Nelson, and Professor Jeff Howarth. During the meeting, Mr. Knelman asserted that he could not play under

---

[2] At Middlebury, all varsity sports teams hold tryouts at the beginning of each season. There is no guarantee that an upperclassman will make a team based solely on past participation.

Coach Beaney and that there needed to be a process to protect student-athletes from a coach's arbitrary behavior. According to Mr. Quinn, the Athletics Department had discussed instituting such a process, but had not yet done so.

After meeting with Mr. Quinn and learning that the Athletics Department had no formal process in place to address his grievance, Mr. Knelman continued to seek redress. From January 28 to February 7, 2011, Mr. Knelman was off campus for an inter-semester break. On February 8, 2011, he met with Associate Dean Karen Guttentag, who suggested that Mr. Knelman submit a formal complaint. Dean Guttentag offered to help Mr. Knelman by reviewing drafts of the complaint. Dean Guttentag also suggested Mr. Knelman meet with Alexa Euler, a Human Resources representative liaison to the Physical Education and Athletics Department. On February 11, 2011, Mr. Knelman met with Ms. Euler and she informed him that Mr. Quinn was the most appropriate person to resolve his grievance.

On February 15, 2011, Mr. Knelman sent an email to Mr. Quinn, requesting an investigation of his dismissal from the varsity hockey team. Drafts of the email which served as Mr. Knelman's "formal complaint" had been reviewed by Professor Howarth, Professor Sutherland, and Dean Guttentag, all of whom provided suggestions. Dean Guttentag assigned Mr. Quinn and Tim Spears, the Vice President of the Administration, to investigate the dismissal.

On February 24, 2011, Mr. Knelman met with Mr. Quinn and Mr. Spears to identify the response he sought to his formal complaint. First, he requested that Middlebury's Athletics Department implement procedures protecting student-athletes. Second, he requested that Coach Beaney be suspended from coaching for the upcoming academic year. Finally, he requested a letter that he could give to future employers explaining his dismissal from the hockey team. Mr. Knelman also informed Mr. Spears that he would no longer play on the varsity hockey team if Coach Beaney remained its coach. Mr. Quinn agreed to provide Mr. Knelman with the letter he requested, but did not agree to any of his remaining demands.

On March 2, 2011, Mr. Knelman again met with Mr. Quinn. Mr. Quinn indicated that Mr. Knelman's complaint would be considered in the course of the Athletics Department's normal review process for coaches. Coaches, including Coach Beaney, are subject to three kinds of review: annual reviews pursuant to the Rules of Reappointment for Physical Education; reviews by the Physical Education Committee on Reappointment ("PEACOR"); and written evaluations from their players at the end of every season. In addition, Mr. Quinn suggested that Mr. Knelman pursue a "mediated meeting" with Coach Beaney to discuss a return to the team in the fall of 2011. With Mr. Knelman's consent, Mr. Quinn contacted Coach Beaney to arrange the meeting. Because Mr. Knelman had advised Mr. Quinn that he was unwilling to play under Coach Beaney, Mr. Quinn cancelled the meeting, determining it would serve no purpose.

On March 9, 2011, Mr. Quinn expressed doubt regarding the effectiveness of a letter and offered to serve as Mr. Knelman's reference instead. Mr. Knelman disagreed with this approach and Mr. Quinn subsequently wrote the requested letter, which he sent to Mr. Knelman on March 15, 2011. The letter to Mr. Knelman stated that although "[a]t the time of your dismissal the Department of Athletics had begun discussions to implement a system by which coaches would be required to report any potential suspensions or dismissals to the Director of Athletics before they took any action of this type," which "would ensure 'due process,' requiring that a coach either make the case for dismissal based on 'dismissal with cause' or a demonstrated and documented 'progressive discipline' which would justify the dismissal," such a "system was not in place at the time you were dismissed from the team." (Doc. 55 at ¶ 108.) The letter stated that because of this, "there was no assurance that these criteria were met," and noted that "[i]n your case it is evident that the coach did not clearly communicate a pattern of misbehavior, nor did you commit an egregious act that would have led to your dismissal by 'cause.'" *Id.*

Mr. Knelman admits that he is not aware of either "an identifiable financial harm or an identifiable lost business opportunity" he suffered as a result of what he characterizes as Coach Beaney's defamatory statements. *Id.* at ¶ 39. During Mr.

6

Knelman's summer internship at Geronimo Wind Energy, he discussed the dismissal with the company's president, Blake Nixon. This discussion occurred after he was hired and did not prevent him from completing his internship. He also discussed his dismissal with a recruiter from Morgan Stanley after applying for a "financial job" for which he was not interviewed. (Doc. 27-3 at 56.)

Mr. Knelman paid $52,120 for tuition, room, and board for the 2010-2011 academic year. Upon graduation, Mr. Knelman plans to spend several months training for hockey. He has no plans to attend graduate school or apply for jobs, with the exception of professional athletic jobs.

As the basis for his breach of contract and breach of the implied covenant of good faith and fair dealing claims, Mr. Knelman relies primarily on the student conduct policies and procedures sections of Middlebury's College Handbook for the 2010-2011 academic year (the "Handbook"). The Handbook does not define a "disciplinary action," but its "Community Standards and General Policies" (the "General Policies"), states that "disciplinary action is distinct from and not dependent upon the outcome of any legal proceedings, although conduct that forms the basis for legal proceedings may also warrant disciplinary action by the College." Doc. 1-4 at 1. The Handbook lists six "General Regulations"[3] and explains that violations of the regulations are "offenses" that "may lead to disciplinary proceedings with penalties up to and including suspension or expulsion." *Id.* at 1-3. The Handbook also states that discipline may be imposed for "flagrant disrespect of persons, flouting of common standards of decency, behavior unbecoming of a Middlebury student, or continued behavior that demonstrates contempt for the generally accepted values of the intellectual." *Id.* at 1-3.

The Handbook describes Middlebury's disciplinary procedures in its "Judicial Boards and Procedures" (the "Procedures"). Middlebury has three judicial bodies that are responsible for administering disciplinary proceedings involving students.

---

[3] The six General Regulations are: (1) respect for persons and property; (2) hazing; (3) respect for the educational function of the College; (4) respect for College officials; (5) respect for College property; and (6) dining room regulations.

Middlebury vests disciplinary power in the Community Judicial Board when a student has been "charged" "by the Judicial Affairs Officer on behalf of the College" with a "non-academic conduct infraction," also referred to in the Procedures as an "offense." (Doc. 1-6 at 1, 4.) The Procedures do not define a "non-academic conduct infraction," but give two examples of possible charges: "disrespect of College official," or "students fighting." *Id.* at 4.

When discussing the sanctions that the Community Judicial Board may ultimately impose, the Handbook's Procedures refer to "violations of conduct regulations" or "nonacademic offenses." The Board has the power to find the student "guilty" or "not guilty" of a "charged" "offense." If the Board finds the student guilty, it has the authority to impose a sanction. The Handbook contains a non-exhaustive list of potential sanctions that the Board may impose if a student is found guilty of a non-academic offense, including "fines or restitution, warnings, reprimands, disciplinary probation, suspension, and expulsion." *Id.* at 7-8.

The Handbook provides that "[d]ue process, insofar as the procedures of the College permit, will be afforded the party charged" and enumerates procedures to be followed during Community Judicial Board proceedings, including notice to the party charged. *Id.* at 1. It also states that all disciplinary procedures are designed "to assure fundamental fairness and to protect students from arbitrary and capricious disciplinary action," and that "[a]ll judicial boards and disciplinary authorities of the College shall conduct their proceedings in the spirit of those principles." *Id.*

The Handbook does not refer to extracurricular activities in its General Policies or Procedures. The "Athletics" section of the Handbook explains that "[t]he academic authority of the College is to control intercollegiate athletic policy," and that "routine administration of rules regarding intercollegiate policy, as they apply to students, shall be the responsibility of the director of athletics in consultation with the Dean of the College." (Doc. 1-7 at 1.) The Athletics section does not refer to disciplinary actions or disciplinary authorities. It states that "[a]ll regularly enrolled undergraduates are eligible for participation in intercollegiate athletics in accordance with the eligibility rules of the

following organizations to which Middlebury maintains membership: National Collegiate Athletic Association (NCAA)[.]" *Id.* With regard to coaches, the Handbook states that "[c]oaching faculty are evaluated in the areas listed below: . . . Commitment to the . . . NCAA Division III Philosophy [and] . . . Adherence to College, Conference, and NCAA rules and policies[.]" (Doc. 1-8 at 2.)

As a secondary basis for his contract-based claims, Mr. Knelman relies upon the NCAA's 2010-2011 manual setting forth the NCAA's "Constitution, Operating Bylaws and Administrative Bylaws" for its Division III member institutions (the "NCAA manual"). The NCAA manual begins with a "Division III Philosophy Statement" which sets forth the NCAA's and Division III members' aspirations. (Doc. 1-3 at 3.) In setting forth these goals, it notes that they articulate "principles that represent a commitment to Division III membership and shall serve as a guide for the preparation of legislation by the division and for planning and implementation of programs by institutions and conferences." *Id.* In a section entitled "The Principle of Student-Athlete Well-Being," it notes that "[i]t is the responsibility of each member institution to establish and maintain an environment that fosters a positive relationship between the student-athlete and coach." *Id.* at 4, § 2.2.4. In this same section, in a subsection entitled "Fairness, Openness and Honesty" it states that "[i]t is the responsibility of each member institution to ensure that coaches and administrators exhibit fairness, openness and honesty in their relationships with student-athletes." *Id.* at 4, § 2.2.5. In addition the NCAA manual states that "student-athletes, coaches, and all others associated with [NCAA] athletics programs and events should adhere to such fundamental values as respect, fairness, civility, honesty and responsibility" by establishing "policies for sportsmanship and ethical conduct in intercollegiate athletics consistent with the educational mission and goals of the institution[.]" *Id.* at 5 § 2.4. The NCAA manual states that coaches "shall act with honesty and sportsmanship at all times so that intercollegiate athletics as a whole, their institutions and they, as individuals, represent the honor and dignity of fair play and the generally recognized high standards associated with wholesome competitive sports." *Id.* at 19, § 11.1. The NCAA manual does not address whether or how a student

9

may require a member institution to comply with one of the manual's "principles" and it contains no specific principles governing how student-athlete discipline such as a dismissal from a team should be administered.

## II.   Disputed Facts.

The parties dispute the manner in which Mr. Knelman discussed changing positions with Coach Beaney. According to Defendants, Mr. Knelman "made no secret" of his desire to change positions and persisted in his requests even after Coach Beaney explained to him why the team needed him in his particular position. (Doc. 27-1 at ¶ 12.) Mr. Knelman admits discussing his position with Coach Beaney on more than one occasion, but asserts all such conversations were amicable and "were invited and encouraged by the coaches." (Doc. 55-2 at ¶ 41.)

The parties also dispute whether Middlebury had reason to believe that Coach Beaney was at risk of engaging in tortious behavior towards one of his players. Defendants assert that "Coach Beaney is a widely respected and beloved coach[.]" (Doc. 27-1 at ¶ 27.) They also point to Coach Beaney's annual and PEACOR reviews, which have generally been positive. In contrast, Mr. Knelman's complaint refers to Coach Beaney as "direct," "blunt" and "disrespectful[,]" and cites negative reviews of Coach Beaney written by student athletes at the end of the 2010-2011 season. (Doc. 55-53 at 2.) For example, one of the student evaluations states that "Coach [Beaney] lacks respect [for] players[.]" (Doc. 55 at ¶ 24.) Mr. Knelman further notes that Mr. Quinn received a letter from the father of a student-athlete, complaining of "several extremely negative encounters" with Coach Beaney and asserting that Coach Beaney "had held it against his son that he was committed to his academics." *Id.* Finally, Mr. Knelman cites the deposition testimony of Thomas Clayton, a junior varsity hockey player, that players had "mixed experiences with [Coach] Beaney." *Id.* at ¶ 27.

Defendants contend that notwithstanding the existence of disputed facts, when these disputes are construed in Mr. Knelman's favor, summary judgment remains appropriate.

## III. Conclusions of Law and Analysis.

### A. Standard of Review.

Summary judgment must be granted when the record shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. "The moving party bears the initial burden of showing why it is entitled to summary judgment." *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In determining whether there is a genuine issue as to any material fact, the trial court "must resolve all ambiguities and draw all inferences in favor of the non-moving party." *Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138, 145 (2d Cir. 2002). The non-moving party must do more than show "some metaphysical doubt" as to the material facts. *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (noting that "mere speculation and conjecture is insufficient to preclude the granting of the motion"). A genuine issue of material fact exists "where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Id.* at 498. "There is no material fact issue only when reasonable minds cannot differ as to the import of the evidence before the court." *Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 51 (2d Cir. 1993).

In this case, the court applies the substantive law of Vermont, the forum state, because federal subject matter jurisdiction is based on diversity of citizenship. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 443 (2d Cir. 2005).

**B.  Count I: Breach of Contract against Middlebury.**

Mr. Knelman cites two sources of contractual promises from Middlebury to him in support of his breach of contract claim: the Handbook and the NCAA Manual.  In doing so, he concedes he had no contractual right to play hockey at Middlebury.  *See Jackson v. Drake Univ.*, 778 F. Supp. 1490, 1493 (S.D. Iowa 1991) (rejecting claim that student who was recruited to play basketball at college and received financial aid to facilitate his matriculation had a contractual right to play on the team); *Hysaw v. Washburn Univ.*, 690 F. Supp. 940, 946-47 (D. Kan. 1987) (rejecting breach of contract claim and noting, "Plaintiffs argue that they were promised that they would be allowed to play football during the 1986-87 season.  Yet the written scholarship contracts they signed make no indication of such promises.").  He nonetheless contends that Middlebury breached a contractual promise to him that he would not be dismissed from the hockey team without due process.  *See* Doc. 54 at 14 ("The specific contractual obligation that Knelman seeks to enforce is Middlebury's obligation to provide him with the specific due process protections set out in the Handbook's Judicial Board and Procedures.").

The Vermont Supreme Court has recognized that the relationship between a student and his or her college is "contractual" in nature.  *Reynolds v. Sterling Coll., Inc.*, 750 A.2d 1020, 1022 (Vt. 2000) (citing *Merrow v. Goldberg*, 672 F. Supp. 766, 774 (D. Vt. 1987); *see also Fellheimer v. Middlebury Coll.*, 869 F. Supp. 238, 242 (D. Vt. 1994).  "The terms of the contract are contained in the brochures, course offering bulletins, and other official statements, policies and publications of the institution."  *Reynolds*, 750 A.2d at 1022 (quoting *Merrow*, 672 F. Supp. at 774 (internal quotations omitted)); *Fellheimer*, 869 F. Supp. at 242.

Not all terms in a student handbook are enforceable contractual obligations, however, and courts will only enforce terms that are "specific and concrete."  *See Reynolds*, 750 A.2d at 1022 (holding that provisions in college publications setting forth tuition required for registration and college's refund policy were "specific and concrete" and became enforceable once students commenced paying tuition); *Merrow*, 672 F. Supp.

12

at 774 (holding that "[i]f a student performs financially, academically and behaviorally in accordance with the college's rules and regulations, he is entitled to the credits in the courses in which he is enrolled") (quoting *Wilson v. Ill. Benedictine Coll.*, 445 N.E.2d 901, 906 (Ill. App. Ct. 1983)); *Fellheimer*, 869 F. Supp. at 242 ("Under *Merrow*, it appears that the College has an obligation to conduct its hearings in a manner consistent with the terms of the Handbook and that a student has a cause of action if he or she can prove that the College deviated from the established procedures.").

Language in a college handbook or other official statement that is merely aspirational in nature, or that articulates a general statement of a school's "ideals," "goals," or "mission," is not enforceable. *See Ullmo ex rel. Ullmo v. Gilmour Acad.*, 273 F.3d 671, 676-77 (6th Cir. 2001) (holding "a breach of contract claim will not arise from the failure to fulfill a statement of goals or ideals"); *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 207 (S.D.N.Y. 1998) (holding that "the mere allegation of mistreatment without the identification of a specific breached promise of obligation does not state a claim on which relief can be granted" and observing that "general promises about ethical standards" are unenforceable); *see also Ambrose v. New England Ass'n of Schs. & Coll.s, Inc.*, 252 F.3d 488, 499 (1st Cir. 2001) (noting that "courts consistently have rejected students' claims of 'educational malpractice' against schools" reflecting their determination that there is a "lack of a satisfactory standard of care by which to evaluate educators' professional judgments and the patent undesirability of having courts attempt to assess the efficacy of the operations of academic institutions") (citations omitted).

Where a "specific and concrete" provision is found, courts must remain cognizant of the academic setting in which the provision is to be enforced. *See Fellheimer*, 869 F. Supp. at 243 (analyzing cases where a "rigid application of contract law" to a college handbook's disciplinary procedures was rejected and noting these cases "do not completely reject the application of contract theory to the student-college relationship; they merely explain that [c]ourts should be wary of the wholesale application of commercial contract principles in the academic context."); *Gally*, 22 F. Supp. 2d at 207 ("[C]laims that sound in tort and ask the Court to involve itself in the subjective

professional judgments of trained educators will not survive a motion to dismiss merely because the plaintiff couches her claims in terms of breach of contract . . . . The application of contract principles to the student-university relationship does not provide judicial recourse for every disgruntled student."); *Jansen v. Emory Univ.*, 440 F. Supp. 1060, 1062-63 (N.D. Ga. 1977) (acknowledging that Fifth Circuit "recognizes that *educational contracts* have unique qualities and are to be construed in a manner which leaves the school sufficient discretion to 'properly exercise its educational responsibility.'") (citation omitted); *Wood v. Strickland*, 420 U.S. 308, 326 (1975) ("It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion.").

Notwithstanding the academic setting, language that accords a college "a great deal of latitude in the administration of its disciplinary proceedings does not . . . lead to the conclusion that it is free to administer disciplinary proceedings in any manner it chooses." *Fellheimer*, 869 F. Supp. at 244. Rather, "the College can breach its obligations to students only by deviating from its own procedures in such a way that the disciplinary action at issue is fundamentally unfair, arbitrary or capricious." *Id.* (observing that: "To be sure, the vast majority of College disciplinary procedures will satisfy this standard, and it is against this standard that . . . the plaintiff's claims of breach of contract must be evaluated."). Consistent with the foregoing principles, the court analyzes Mr. Knelman's breach of contract claims.

### 1. Contractual Claims Based on the Handbook.

Mr. Knelman argues that his dismissal from the hockey team was a form of discipline, and that under his contract with Middlebury, the Community Judicial Board had the sole authority to impose that sanction. In the alternative, he argues that Coach Beaney was a "disciplinary authority" as set forth in the Handbook, and was thus required to conduct dismissal proceedings in a manner that assured fundamental fairness and protected Mr. Knelman from arbitrary and capricious disciplinary action.

Middlebury counters that none of the disciplinary procedures set forth in the Handbook apply to extracurricular activities, such as athletics. Instead, those disciplinary

procedures are triggered only when a student is "charged" with a violation of Middlebury's conduct regulations. It further contends that Coach Beaney is not a "disciplinary authority" because he was never empowered to administer any of the sanctions set forth in the Handbook.

The court first addresses Mr. Knelman's contention that the Community Judicial Board alone had the power to dismiss him from the hockey team. The Handbook clearly and unambiguously states that the Board's jurisdiction attaches when a student has been "charged" by the Judicial Affairs Officer with a non-academic conduct infraction or offense. It is undisputed that Middlebury's Judicial Affairs Officer never "charged" Mr. Knelman with a non-academic conduct offense or infraction, and thus the Community Judicial Board's jurisdiction was never triggered. It thus could not have disciplined Mr. Knelman for leaving the Banquet early or for any other offense. Moreover, dismissal from an extracurricular activity, such as hockey, is not among the list of "sanctions" that can only be imposed by the Community Judicial Board after finding a student-athlete "guilty" of a non-academic conduct offense. Accordingly, the Handbook does not grant the Community Judicial Board sole authority to dismiss a student from an athletic team.

Mr. Knelman's alternative argument that Coach Beaney, as a "disciplinary authority" under the Handbook, was empowered to dismiss Mr. Knelman from the hockey team, but only after providing him with some manner of due process is equally unpersuasive. Because Coach Beaney dismissed Mr. Knelman before notifying him of any specific charges, giving him an opportunity to hear and confront the evidence against him, or making any adverse findings in accordance with a preponderance of the evidence standard, Mr. Knelman argues that Coach Beaney's actions were fundamentally unfair, arbitrary and capricious, and was a breach of Middlebury's contract. This argument stems from the Handbook's statement that all disciplinary procedures are designed "to assure fundamental fairness and to protect students from arbitrary or capricious disciplinary action," and that "[a]ll judicial boards and disciplinary authorities of the College . . . shall conduct their proceedings in the spirit of those principles." *Id.* at 240.

The Handbook does not define the term "disciplinary authorities." By virtue of its plain language, the term "disciplinary authorities" obviously refers to a Middlebury official who is authorized to administer discipline for a violation of the Handbook's regulations and policies.[4] *See* American Heritage College Dictionary (3d ed.) at 395 (defining "disciplinary" as "[o]f, relating to, or used for discipline") and at 92 (defining "authorities" as one who has "[t]he power to enforce laws, exact obedience, command, determine or judge."). A non-exhaustive list of "discipline" which a student who is found "guilty" of a "non-academic" offense may receive includes "Fines or restitution," "Warnings," "Reprimands," "Disciplinary Probation," "Suspension," and "Expulsion." (Doc. 1-6 at 7–8.) There is no evidence that Coach Beaney was authorized to impose any of these sanctions which clearly refer to suspension and expulsion from *the college* rather than from one of its teams. Even if dismissal from an extracurricular activity represents a potential sanction, Mr. Knelman remains faced with the undisputed fact that he was never "charged" with a violation of the Middlebury's regulations or policies, much less found "guilty." He thus cannot establish that the Handbook's reference to "disciplinary authorities" includes a coach making decisions regarding who will play on an extracurricular team.

To the extent Mr. Knelman argues that Middlebury was required to "charge" him and find him "guilty" before he could be dismissed from the hockey team, he cites no provision of the Handbook which *requires* Middlebury to take disciplinary action against any student for a non-academic conduct offense. *Cf. Vaughan v. Vt. Law Sch., Inc.*, 2011

---

[4] Vermont law requires courts to accord contractual terms their "plain meaning." *Southwick v. City of Rutland*, 2011 VT 105, ¶ 5, 30 A.3d 1298 ("When the plain language of the writing is unambiguous, we take the words to represent the parties' intent, and the plain meaning of the language governs our interpretation of the contract.") (internal citation omitted). A term does not become ambiguous simply because it is not defined. *See Concord Gen. Mut. Ins. Co. v. Madore*, 2005 VT 70, ¶¶ 9-10, 178 Vt. 281, 283, 285, 882 A.2d 1152, 1155 (noting that when confronted with an undefined term in an insurance contract, "we may take judicial notice of its dictionary definition to determine its popular meaning," and defining policy term "sexual molestation" in accordance with this approach); *Hardwick Recycling & Salvage, Inc. v. Acadia Ins. Co.*, 2004 VT 124, ¶ 26, 177 Vt. 421, 432, 869 A.2d 82, 91 (observing that the term "damages" was undefined in insurance contract, and "[r]ecognizing that the court may take judicial notice of an insurance term's dictionary definition when that term is not defined by the policy").

WL 3421521, at *15-16 (D. Vt. Aug. 4, 2011) (the school's Code of Conduct expressly "committed," and thus contractually obligated, the school to investigating allegations of sexual harassment). Instead, the Handbook merely provides that in the event Middlebury decides to impose discipline for a non-academic conduct offense, it must follow certain procedures in doing so. Dismissal from an athletic team that does not arise from a "charged" "offense" is not included.

Essentially, Mr. Knelman asks the court to extend the disciplinary procedures of the Handbook to athletics, even though the "Athletics" section of the Handbook does not reflect that intent. In accordance with this interpretation, the Handbook's Procedures would be triggered any time a player was cut from a team, benched, suspended, dismissed, or otherwise suffered a material adverse change in circumstances as the result of a coach's determination that some form of discipline for the player was warranted. Not only would this interpretation produce irrational results,[5] there is no support for it in the Handbook. Courts "do not read terms into [a] contract unless they arise by necessary implication." *Downtown Barre Dev. v. C & S Wholesale Grocers, Inc.*, 2004 VT 47, ¶ 9, 177 Vt. 70, 75, 857 A.2d 263, 267. Here, no such implication may be found. Moreover, Vermont law places the burden squarely upon a student to identify a "specific and concrete" promise in a student handbook before a breach of contract claim may proceed. In opposing summary judgment, Mr. Knelman fails to demonstrate that he was entitled to any of the disciplinary procedures set forth in the Handbook.

Mr. Knelman points to several other provisions of the Handbook that he asserts support his breach of contract claim. He claims that Coach Beaney did not comply with ethical standards in the Handbook requiring faculty to "respect the dignity, freedom, and rights of others," (Doc. 1-4 at 1), to "conduct themselves ethically, honestly, and with integrity in all dealings," (Doc. 1-5 at 1), and to ensure that "the intercollegiate athletic

---

[5] *See State v. Philip Morris USA Inc.*, 2008 VT 11, ¶ 18, 183 Vt. 176, 185, 945 A.2d 887, 894 (noting that "nonsensical" interpretations of contracts are disfavored because people are unlikely to make contracts with absurd results) (citation omitted); *Post v. Killington, Ltd.*, 2010 WL 3323659, at *7 (D. Vt. May 17, 2010) (rejecting an interpretation of ski pass provisions that would potentially require the defendant to operate a ski resort for the plaintiffs' sole benefit).

program is a well-integrated part of the entire educational endeavor." (Doc. 1-7 at 1.) These provisions are general statements of ideals as opposed to promises for specific treatment in specific situations, and thus they cannot give rise to contractual obligations. *See Ullmo*, 273 F.3d at 677 ("Indefinite and aspirational language does not constitute an enforceable promise."); *Gally*, 22 F. Supp. 2d at 207 ("[T]he general promises about ethical standards which plaintiff now points to are far different from the types of specific promises which have led to valid breach of contract claims against universities."). Were the court nonetheless to treat them as contractual obligations, they would not support a claim by Mr. Knelman that *he* was deprived of procedural safeguards to which *he* was entitled if a coach failed to comport with these standards.

A similar flaw pervades Mr. Knelman's further argument that Middlebury breached its contract by failing to take action against Coach Beaney for Coach Beaney's behavior. For support, Mr. Knelman points to sections of the Handbook prohibiting hazing and harassment. These provisions do not obligate Middlebury to commence disciplinary proceedings against *a coach*; instead, they merely give Middlebury the authority to do so when the offense is committed by *a student*. Indeed, these procedures are contained in a section entitled "Student Conduct, Policies, and Procedures." Mr. Knelman cites no support for the proposition that these provisions also govern Middlebury's authority to discipline its educators, coaches, and staff.

In summary, Mr. Knelman fails to point to any "specific and concrete term of the contract[,]" *Reynolds*, 750 A.2d at 1022, which supports his breach of contract claim based upon Middlebury's alleged failure to follow its own disciplinary procedures as set forth in the Handbook. He has therefore failed to establish an essential element of his claim and summary judgment must be granted. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) 322 ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

## 2. Contractual Claims Based on NCAA's Manual.

Mr. Knelman cites two grounds on which he urges the court to find that Middlebury is contractually obligated to adhere to the NCAA manual. First, he asserts that the NCAA manual is incorporated by reference into the Handbook because "Middlebury promised in its College Manual to comply with the NCAA Division III's rules and regulations." (Doc. 1 at ¶ 88.) Second, he argues that he is an intended third-party beneficiary of the contract between Middlebury and the NCAA. The court addresses these claims first before deciding whether the Manual contains enforceable promises.

Unlike the Handbook, the NCAA's manual is not one of Middlebury's "official statements, policies, or publications," and thus it is not part of Middlebury's contract with its students unless Middlebury has specifically promised otherwise. *See Fellheimer*, 869 F. Supp. at 242–44 (a college is only bound to provide students with the procedures it has promised). Mr. Knelman has not directed the court to any provision in the Handbook wherein Middlebury has promised that it will comply with the NCAA manual's fairness provisions. Although the Handbook refers to the NCAA, those references are related only to NCAA eligibility[6] and to rules for evaluating coaching faculty.[7] Mr. Knelman has not based his contract claims on either of these premises. The Handbook thus does not incorporate by reference the "fairness" provisions of the NCAA manual on which Mr. Knelman relies.[8] *See Giuliani v. Duke Univ.*, 2010 WL 1292321, at **7-8 (M.D.N.C.

---

[6] *See* Doc. 1-7 at 1 ("All regularly enrolled undergraduates are eligible for participation in intercollegiate athletics in accordance with the eligibility rules of the following organizations to which Middlebury maintains membership: National Collegiate Athletic Association (NCAA)[.]").

[7] *See* Doc. 1-8 at 2 ("Coaching faculty are evaluated in the areas listed below: . . . Commitment to the . . . NCAA Division III Philosophy [and] . . . Adherence to College, Conference, and NCAA rules and policies[.]").

[8] Mr. Knelman describes these promises as follows: "As an NCAA Division III school, Middlebury is required to have polices to assure student-athletes are treated fairly. Among other things, it is Middlebury's responsibility to ensure that coaches and administrators 'exhibit

Mar. 30, 2010) (dismissing as implausible plaintiff's claim that his contract with the university included, among other things, a NCAA Manual for Division I schools).

Second, Mr. Knelman claims that he can enforce the NCAA manual as an intended "third-party beneficiary" of Middlebury's contract with the NCAA. Vermont law recognizes that a third party has the right to enforce a contract if he or she was an intended, rather than a mere incidental, beneficiary "based on the original contracting parties' intention." *McMurphy v. State*, 757 A.2d 1043, 1049 (Vt. 2000). Vermont has adopted the Restatement (Second) of Contracts to determine whether a person has intended third-party beneficiary status:

> "[A] beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."

*Herbert v. Pico Ski Area Mgmt. Co.*, 2006 VT 74, ¶ 15, 180 Vt. 141, 908 A.2d 1011 (quoting Restatement (Second) of Contracts § 302(1) (1981)); *see also McPheeters v. McGinn, Smith and Co., Inc.*, 953 F.2d 771, 773 (2d Cir. 1992) ("A third-party beneficiary exists, however, only if the parties to that contract intended to confer a benefit on him when contracting; it is not enough that some benefit incidental to the performance of the contract may accrue to him.") (internal quotations and citations omitted).

Here, Mr. Knelman fails to establish either of the circumstances that may give rise to intended third-party beneficiary status under Vermont law. In particular, he fails to demonstrate that Middlebury and the NCAA intended to confer upon Mr. Knelman or other student-athletes the benefit of the "fairness" provisions on which he relies in the NCAA manual, such that he would have an enforceable right to their performance. *See McCarthy v. Azure*, 22 F.3d 351, 362 & n.16 (1st Cir. 1994) ("Because third-party beneficiary status constitutes an exception to the general rule that a contract does not

---

fairness, openness and honesty in their relationships with student-athletes.'" (Doc. 54 at 9-10) (internal citations omitted).

grant enforceable rights to nonsignatories . . . a person aspiring to such status must show with special clarity that the contracting parties intended to confer a benefit on him. . . . These requirements are not satisfied merely because a third party will benefit from the performance of the contract.").

The Second Circuit has expressed some doubt regarding whether a student has the right to require his or her educational institution to enforce the NCAA's rules and regulations. Concluding that the district court erred in granting a student-athlete a preliminary injunction based upon NCAA eligibility requirements, the Second Circuit declined to affirmatively recognize the possibility of an intended third-party beneficiary relationship and rejected the arguments Mr. Knelman makes in this case:

> The district court purported to find without adequate explanation that some sort of a contractual duty was owed by the NCAA to Phillip as a result of the contracts between Fairfield [University] and the NCAA and Phillip and the NCAA. We express no view of whether such a duty did exist. However, we think it clear that the district court erred in finding that the NCAA evidenced bad faith simply by acting arbitrarily. Connecticut law requires more. As the Connecticut Supreme Court recently reiterated, '[b]ad faith means more than mere negligence, it involves a dishonest purpose. Or, as has also been said, "[n]eglect or refusal to fulfill a contractual obligation can be bad faith only if prompted by an interested or sinister motive. The district judge, however, seemed to be of the view that arbitrary enforcement of one's own rules alone could establish the likely merit of a breach of contract claim. Indeed, the district court opined that "if it can be shown that the [waiver] rule has been violated for no good reason in this case, then I see no reason why this plaintiff should not get relief." . . . [A]s the district court has not made a "likelihood of success" finding using the correct rule of Connecticut law, we do not believe the injunction should remain in place any longer than necessary.

*Phillip v. Fairfield Univ.*, 118 F.3d 131, 135 (2d Cir. 1997) (internal citations omitted); *see also Hall v. Nat'l Collegiate Athletic Ass'n*, 985 F. Supp. 782, 796-97 (N.D. Ill.1997) (rejecting preliminary injunction for freshman who was found ineligible under NCAA rules and regulations and noting that there "can be no doubt that an important function of the NCAA and its constitution, bylaws, and regulations, is to benefit student athletes. It is not clear, however, that this fact is sufficient to elevate a student from an incidental to

an intended beneficiary" but "assuming" this status, no breach of contract claim was stated).

Moreover, although a few courts have recognized intended third-party beneficiary status based upon the relationship between a member institution and the NCAA, these cases are confined to enforcement of NCAA's eligibility requirements. *See, e.g., Bloom v. Nat'l Collegiate Athletic Ass'n*, 93 P.3d 621, 623-24 (Colo. App. 2004) (although state college football player had standing as third-party beneficiary to challenge NCAA's eligibility requirements because "the NCAA's constitution, bylaws, and regulations evidence a clear intent to benefit student-athletes," he was not entitled to injunctive relief as he failed to "demonstrate a reasonable possibility of success on the merits"); *Oliver v. Nat'l Collegiate Athletic Ass'n*, 155 Ohio Misc. 2d 8, 13-14, 920 N.E.2d 198, 200 (2008) (noting that "the member institutions agree to let the NCAA set the criteria and to abide by the NCAA's final eligibility decision," and ruling that "[t]he [student-athlete] plaintiff, who is not a party to the contract between NCAA and [the student's university], stands to benefit from the contract's performance, and thus he acquires rights under the contract as well as the ability to enforce the contract once those rights have vested."). Mr. Knelman fails to identify a single case in which a court has held that a student-athlete is an intended third-party beneficiary of the NCAA manual's "fairness" provisions and is entitled to recover for breach of contract if a member institution fails to adhere to them. *See Hairston v. Pacific 10 Conference*, 101 F.3d 1315, 1320 (9th Cir. 1996) (intended third-party beneficiary relationship could not be inferred from the "vague, hortatory pronouncements" of the Pac-10's constitution or mission statement including goals intended to benefit student athletes because, "[by] themselves, these pronouncements are not sufficient to support the players' claim that the Pac-10 intended to assume a direct contractual relationship to every football player on a Pac-10 team.") (quoting *Hairston v. Pacific-10 Conference*, 893 F. Supp. 1485, 1494 (W.D.Wash. 1994)) (internal quotation marks omitted).

In this case, the court need not decide the issue because the "fairness" provisions of the NCAA's Manual on which Mr. Knelman relies create general ethical

responsibilities and aspirations rather than "specific and concrete" promises required by Vermont law for a breach of contract claim. *See Reynolds*, 750 A.2d at 1023; *see also Gally*, 22 F. Supp. 2d at 208; *Ullmo*, 273 F.3d at 677. Accordingly, in the unlikely event that Mr. Knelman could establish intended third-party beneficiary status under Vermont law, he could not further establish that Middlebury had breached "specific and concrete" promises contained in the NCAA manual. His breach of contract claim based upon the NCAA manual must therefore be dismissed.

For the foregoing reasons, the court GRANTS summary judgment for Defendants on Mr. Knelman's breach of contract claims.

### C.    Count II: Breach of the Covenant of Good Faith and Fair Dealing against Middlebury.

Mr. Knelman brings a claim for breach of the implied covenant of good faith and fair dealing against Middlebury, contending that Middlebury violated community standards of decency by failing to sanction Coach Beaney and by failing to provide Mr. Knelman with a hearing before dismissing him from the hockey team. Middlebury contends that it is entitled to summary judgment on this claim, arguing that Mr. Knelman does not present sufficient evidence to establish a breach of the implied covenant of good faith and fair dealing.

Under Vermont law, a "covenant of good faith and fair dealing is implied in every contract." *Century Partners, LP v. Lesser Goldsmith Enters., Ltd.*, 2008 VT 40, ¶ 21, 184 Vt. 215, 224, 958 A.2d 627, 633 (citing *Carmichael v. Adirondack Bottled Gas Corp. of Vt.*, 635 A.2d 1211, 1216 (Vt. 1993)). It is "an implied-in-law promise not to do anything to undermine or destroy [the plaintiff's] rights to receive the benefit of the parties' . . . agreement." *R & G Props., Inc. v. Column Fin., Inc.*, 2008 VT 113, ¶ 46, 184 Vt. 494, 514, 968 A.2d 286, 300 (quotations omitted). The covenant "ensures that parties act with faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *Century Partners*, 2008 VT at ¶ 21, 184 Vt. at 224-25, 958 A.2d at 633 (quoting *Carmichael*, 635 A.2d at 1216) (internal quotations omitted). Although "[g]ood faith is ordinarily a question of fact," plaintiffs are required to "provide

a basis on which the fact finder can find a violation." *R & G Props.*, 2008 VT at ¶ 46, 184 Vt. at 514, 968 A.2d at 301. Summary judgment will be granted "where the nonmoving party cannot show how the other undermined or destroyed its rights under the contract." *Howard Opera House Assocs. v. Urban Outfitters, Inc.*, 166 F. Supp. 2d 917, 934 (D. Vt. 2001).

Mr. Knelman concedes that his contract with Middlebury afforded him no right to play hockey. In addition, he has identified no contractual right to the Handbook's disciplinary procedures nor any contractual right to force Middlebury to address Coach Beaney's behavior. Accordingly, his implied covenant of good faith and fair dealing claim seeks to impose upon Middlebury contractual obligations that do not otherwise exists. Vermont law does not permit the implied covenant to be used in this manner. *See Post*, 2010 WL 3323659, at *16 (ruling that the implied covenant could not be used to add provisions to ski passes that did not otherwise exist); *Eastern Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 182 (4th Cir. 2000) (The covenant of good faith and fair dealing "'does not obligate a [party] to take affirmative actions that the [party] is clearly not required to take under [the contract].'" (citation omitted) (cited with approval in *Downtown Barre Dev.*, 2004 VT 47, ¶ 18, 177 Vt. 70, 857 A.2d 263); *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 199 (2d Cir. 2005) (implied duty of good faith and fair dealing cannot be used to "add[ ] to the contract a substantive provision not included by the parties") (quotation omitted); *Compania Embotelladora del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 324 (S.D.N.Y. 2009) (implied covenant "cannot be used to impose 'obligations that were not explicitly part of the agreement'") (citation omitted).

Because Mr. Knelman has not established any contractual rights that have been "undermined or destroyed," *Howard Opera House Assocs.*, 166 F. Supp. 2d at 934, his implied covenant of good faith and fair dealing claim fails as a matter of law and summary judgment is appropriate. *See Post v. Killington, Ltd.*, 424 Fed. App'x 27, 31 (2d Cir. 2011) (affirming dismissal of implied covenant claim on summary judgment because "no evidence indicated that [defendant] acted outside its [contractual] rights."); *Southface Condo. Owners Ass'n Inc. v. Southface Condo. Ass'n, Inc.*, 169 Vt. 243, 248,

733 A.2d 55, 59 (1999) (overturning jury verdict finding breach of the implied covenant where no evidence indicated "defendants took action contrary to their agreement with [plaintiffs]").

For reasons stated above, the court GRANTS summary judgment for Defendants on Mr. Knelman's claim for breach of the implied covenant of good faith and fair dealing.

### D. Counts III and IV: Breach of Fiduciary Duty Against Middlebury and Coach Beaney.

In Counts III and IV of his Complaint, Mr. Knelman claims that Defendants owed him fiduciary duties, which they breached by failing to act in good faith and in his best interests. Defendants respond that Vermont does not now recognize, and is not likely to recognize in the future, a fiduciary relationship between students and schools or school officials.

Under Vermont law, the existence or nonexistence of a fiduciary relationship is a question of law for the court. *See Doe v. Newbury Bible Church*, 2005 WL 1862118, at *6 (D. Vt. July 20, 2005) (citing *McGee v. Vt. Fed. Bank, FSB*, 726 A.2d 42, 44 (Vt. 1999)). A fiduciary relationship arises "when one person 'is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Handverger v. City of Winooski*, 2011 VT 134, ¶ 11, 38 A.3d 1158, 1161 (quoting *Cooper v. Cooper*, 783 A.2d 430, 436 (Vt. 2001)); *see also Carr v. Peerless Ins. Co.*, 724 A.2d 454, 460 (Vt. 1998) (a fiduciary must act "for the benefit of the principal except as otherwise agreed"). The relationship must have "ripen[ed] into one in which [one party was] dependent on, and reposed trust and confidence in [the other party] in the conduct of its affairs." *Ascension Tech. Corp. v. McDonald Invs., Inc.*, 327 F. Supp. 2d 271, 276 (D. Vt. 2003) (quoting *McGee*, 726 A.2d at 44).

The Vermont Supreme Court has never recognized a fiduciary relationship between a student and a school or school official. Courts in the Second Circuit have held that a fiduciary relationship generally does not exist in the school context. *See Bass ex rel. Bass v. Miss Porter's Sch.*, 738 F. Supp. 2d 307, 330 (D. Conn. 2010) (finding no

25

fiduciary relationship between a student and a private high school, and noting that the court's research "has not revealed a single case in any state or federal court within the Second Circuit holding or even suggesting that a secondary school -- public or private, boarding or day-session -- or its employees owe a fiduciary duty to its students"). Courts in other jurisdictions have reached the same conclusion. *See McFadyen v. Duke Univ.*, 786 F. Supp. 2d 887, 986 (M.D.N.C. 2011) (noting that "the student-administrator relationship is not generally a fiduciary relationship"); *Hendricks v. Clemson Univ.*, 578 S.E. 2d 711, 715-16 (S.C. 2003) (finding no fiduciary relationship between a university student and university advisor under South Carolina law).

In rejecting a fiduciary relationship between a school and one of its students, courts have reasoned that schools and school officials owe duties to *all* students, and fiduciary relationships typically involve a special relationship between the parties which requires the fiduciary to exalt the interests of his or her dependent over the competing interests of others, and to act exclusively on the dependent's behalf. Such a relationship would immediately prove unworkable in the school context. *See McFadyen*, 786 F. Supp. 2d at 986-87 (holding school officials are not fiduciaries because they have to serve other interests, "including the objectives of the institution and the interests of the public," and observing that those "divided loyalties" prevented the relationship from being like "other fiduciary relationships in which the fiduciary must act primarily for the benefit of another" ).

The Vermont Supreme Court has cited these same concerns in refusing to recognize a fiduciary relationship in an analogous context. *See Bovee v. Gravel*, 811 A.2d 137, 140 (Vt. 2002) (refusing to recognize a fiduciary relationship between a corporation's attorney and each of the corporation's shareholders, as such a relationship would subject the attorney to "diverse needs and interests" and create "potentially unlimited liability"). It has also held that the duty of a school and its officials to a student is governed by statute and is a "duty of ordinary care." *See Edson v. Barre Supervisory Union No. 61*, 2007 VT 62, ¶9, 182 Vt. 157, 160, 933 A.2d 200, 203-04 (quoting 16 V.S.A. § 834). In turn, it has noted that, "[u]nder our common law, 'ordinary care'

requires individuals to act as a reasonably prudent person would under the circumstances." *Edson*, 2007 VT at ¶ 10, 182 Vt. at 161, 933 A.2d at 204. In *Edson,* the court held that "ordinary care" was the appropriate duty of care in the context of a fifteen year old high school student who left school without authorization and was subsequently murdered by the adult who picked her up on school property. Against this backdrop, it is inconceivable that the Vermont Supreme Court would impose a higher duty of care -- that of a fiduciary -- between a college or university and an adult student regarding the college student's status on an extracurricular hockey team.

Mr. Knelman nonetheless argues that the court should afford him the opportunity to prove a fiduciary relationship at trial, noting that several courts in other jurisdictions have denied dispositive motions in the school context where the facts involve the exploitation of a position of trust or authority. For example, in *Colli v. S. Methodist Univ.*, 2010 WL 7206216 (N.D. Tex. Aug. 17, 2010), a student reported to her school's athletic director allegations of "harassment, violations of the Honor Code, and concerns about the attitude of the coaching staff regarding student use of drugs and alcohol." *Id.* at *6. The school allegedly failed to investigate the student's allegations, punished teammates who openly supported her, and revoked her athletic scholarship. *Id.* The court denied summary judgment because the "existence of a confidential relationship is usually a question of fact" and "a reasonable jury could find that [the plaintiff's] act of reporting . . . created an informal fiduciary relationship[.]" *Id.* (noting that under Texas law, an informal or confidential relationship may give rise to a fiduciary duty "where one person trusts in and relies upon another") (internal quotation and citation omitted).

Likewise, in *Chou v. Univ. of Chi.*, 254 F.3d 1347 (Fed. Cir. 2001), a student claimed that her advisor "held a position of superiority over her as her department chairman, and that he had specifically represented to her that he would protect and give her proper credit for her research and inventions." *Id.* at 1362. The advisor subsequently named himself as the inventor of all her discoveries. *Id.* at 1363. The Court of Appeals found that the district court erred in dismissing the student's claim that the advisor breached his fiduciary duties because the student had adequately pleaded special

27

circumstances. *Id.* at 1362 (noting that under Illinois law, a fiduciary relationship may arise automatically or "from the special circumstances of the parties' relationship, such as when one party justifiably places trust in another so that the latter gains superiority and influence over the former").

In both *Colli* and *Chou*, the alleged fiduciary relationships were created by special circumstances. The *Colli* and *Chou* courts recognized that when school officials affirmatively exploit a position of trust or authority over a student to the student's detriment, the existence of a limited fiduciary duty may be a question of fact for the jury. Here, no special circumstances have been established.[9]

As a final argument, Mr. Knelman urges the court to not reject his novel legal claim, noting that generally a claim based upon a novel legal theory should not be dismissed before trial "because of the mere novelty of the allegations" but rather the "legal theory of a case should be explored in the light of facts as developed by the evidence[.]" *Ascension*, 327 F. Supp. 2d at 277. While this may be appropriate in some cases, here there is no basis upon which the court may predict that the Vermont Supreme Court is likely to recognize a fiduciary relationship between a college and its coach and a student-athlete. It does not currently recognize one, which alone may be grounds for dismissal. *See Lieberman v. A&W Rests., Inc.*, 2003 WL 21252008, at *7 (D. Minn. May 28, 2003) (dismissing claim when, to accept it "would be to recognize a new cause of action[.]"). But more importantly, it is exceedingly unlikely that the Vermont Supreme Court would impose a fiduciary duty in the circumstances of this case. Such an approach would be contrary to existing Vermont law and is not supported by the weight of authority elsewhere. It would also create an untenable situation in which a college simultaneously owed a fiduciary duty to students with competing interests, whose

---

[9] Mr. Knelman seeks to create a fiduciary relationship based upon the deposition testimony of Mr. Quinn who testified that he needs to "be trustworthy to be able to run the department" and Coach Beaney "would need to be trustworthy as well to maintain the integrity of the institution and the program." (Doc. 54 at 20) (citations omitted). Not only are such stray observations insufficient to create a fiduciary duty where one does not otherwise exist, it is clear that Mr. Quinn is describing obligations he and Coach Beaney owe to Middlebury, not to Mr. Knelman.

interests were not only also separate and distinct from one another's, but also often in conflict with the interests of the college itself. As the Vermont Supreme Court has recognized, a fiduciary duty cannot be imposed where it would require the fiduciary to protect "diverse needs and interests" and where it would create "potentially unlimited liability." *See Bovee*, 811 A.2d at 140 (Vt. 2002).

For the reasons given above, the court GRANTS Defendant's motion for summary judgment on Mr. Knelman's claim for breach of fiduciary duties set forth in Counts III and IV.

### E. Count V: Defamation Against Middlebury and Coach Beaney.

In Count V, Mr. Knelman alleges that Coach Beaney knowingly or recklessly made the following defamatory statements about him: (1) during the team meeting where Mr. Knelman admitted to leaving the Banquet early, Coach Beaney called him "selfish"; (2) when dismissing Mr. Knelman from the team, Coach Beaney stated to Mr. Knelman "[y]ou have a lot of things on your plate and I just don't think hockey is a priority" (Doc. 55-2 at ¶ 40); (3) when Mr. Knelman asked whether his dismissal was due to leaving the Banquet early, Coach Beaney stated that although the Banquet was part of the reason, "we had problems with you last year throughout" (Doc. 55-2 at ¶ 40); and (4) while explaining his reasons for dismissing Mr. Knelman to the rest of the team, Coach Beaney stated that this was "not an isolated incident." (Doc. 55 at ¶ 38.)

Under Vermont law, the elements of a defamation claim are: (1) "a false and defamatory statement concerning another"; (2) "some negligence, or greater fault, in publishing the statement"; (3) "publication to at least one third person"; (4) "lack of privilege in the publication"; (5) "special damages, unless actionable per se"; and (6) "some actual harm so as to warrant compensatory damages." *Russin v. Wesson*, 2008 VT 22, ¶ 5, 183 Vt. 301, 303, 949 A.2d 1019, 1020 (quoting *Lent v. Huntoon*, 470 A.2d 1162, 1168 (Vt. 1983)).

### 1. False and Defamatory Statement.

As Mr. Knelman conceded at oral argument, Coach Beaney's statement that Mr. Knelman was "selfish" was a statement of opinion that could neither be proved nor

disproved. Coach Beaney's further statement that Mr. Knelman "had a lot on his plate" and that hockey was not a "priority" for him appears to share these same characteristics. Whether a statement is opinion or fact is a question of law for the court. *See Mr. Chow of New York v. Ste. Jour Azur S.A.*, 759 F.2d 219, 224 (2d Cir. 1985) ("It is also clear that the determination of whether a statement is opinion or rhetorical hyperbole as opposed to factual representation is a question of law for the court.").

In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), the United States Supreme Court held that, "[u]nder the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Id.* at 339-340. Courts have thus routinely rejected defamation claims based upon a "pure" opinion that is not susceptible of being proven true or false. *See, e.g., Old Dominion Branch No. 496, Nat'l Assoc. of Letter Carriers v. Austin*, 418 U.S. 264, 284 (1974) (noting that "the only factual statement in the disputed publication is the claim that appellees were "scabs" and finding that "[t]he definition's use or words like 'traitor' cannot be construed as representations of fact."); *Madison v. Frazier*, 539 F.3d 646, 654 (7th Cir. 2008) (noting that statements of opinion are not actionable including a reference to plaintiff that he was among the people who were "all black, and all too selfish, too afraid, and too complacent to 'practice what they preach'"); *Mr. Chow of New York*, 759 F.2d at 223 ("[W]e have held that generally one cannot be liable simply for expressing an opinion" and concluding that restaurant reviewer's opinions regarding the quality of restaurant's food are not actionable); *Yohe v. Nugent*, 321 F.3d 35, 41 (1st Cir. 2003) (police chief's statement that he believed plaintiff was suicidal was an opinion that could not give rise to a defamation claim); *Mangan v. Corporate Synergies Group, Inc.*, 834 F. Supp. 2d 199 (D. N.J. 2011) (applying New Jersey law and ruling CEO's statements that company had lost faith in former CEO's leadership ability and management skills are nonactionable opinions).

Applying New York law, the Second Circuit identified the factors courts in that state consider in determining whether something is a "fact" or an "opinion:"

> (1) An assessment of whether the specific language in issue has a precise meaning which is readily understood or whether it is indefinite and ambiguous; (2) a determination of whether the statement is capable of being objectively characterized as true or false; (3) an examination of the full context of the communication in which the statement appears; and (4) a consideration of the broader social context or setting surrounding the communication including the existence of any applicable customs or conventions which "might signal to readers or listeners that what is being read or heard is likely to be opinion, not fact."

*Kirch v. Liberty Media Corp.*, 449 F.3d 388, 403 (2d Cir. 2006) (citation omitted).[10] Although Vermont has not adopted a similar test, it is likely to find these same or similar factors relevant to its analysis. Accordingly, the court examines Coach Beaney's statements using *Kirch*'s guiding principles. In doing so, it agrees with Mr. Knelman that Coach Beaney's statement that he was "selfish" in the context of a discussion of his leaving the Banquet reflected Coach Beaney's personal opinion of Mr. Knelman's conduct that would be impossible to verify. The statement does not suggest that it is based upon undisclosed facts or that it has factual content. To the contrary, it would readily be understood by listeners as a statement of pure opinion in the context in which it was made.

Coach Beaney's further statement, made only to Mr. Knelman (which further raises the issue of publication), that Mr. Knelman had a "lot on his plate" and did not regard hockey as a "priority" also reflects pure opinion. The statement is not capable of being proven true or false as there is no common understanding of what would constitute "a lot" on a college student's "plate." Similarly, whether something is a "priority" or not is a question of degree to which reasonable minds could differ. The statement was made

---

[10] *See also Yohe*, 321 F.3d at 41 (holding the test for fact vs. opinion under Massachusetts law requires courts to examine "the statement in its totality and in the context in which it was uttered or published[,]" "consider all the words used . . . [while giving] weight to cautionary terms used by the person publishing the statement[,]" and consider "all of the circumstances surrounding the statement."); *Frazier*, 539 F.3d at 654 (holding Illinois law requires consideration of "several nonexclusive factors" including "(1) whether the statement has a precise and readily understood meaning; (2) whether the statement is verifiable; and (3) whether the statement's literary or social context signals that it has factual content.").

in the context of a private discussion between Coach Beaney and Mr. Knelman in which Coach Beaney conveyed his personal impression of Mr. Knelman's commitment to the hockey team. The statement was thus a pure opinion that cannot provide a basis for Mr. Knelman's defamation claim.

Coach Beaney's two remaining statements that Mr. Knelman "had problems last year" and that the Banquet "was not an isolated incident" are either accurate or inaccurate. Although they clearly reflect Coach Beaney's opinions, they fall within the category of "mixed" opinion for which a defamation claim may lie. *See Flamm v. American Ass'n of Univ. Women*, 201 F.3d 144, 153-155 (2d Cir. 2000) (statement in non-profit organization's directory of lawyers that at least one client had referred to attorney as an "ambulance chaser" who was only interested in "slam dunk cases" might reasonably be interpreted as factual statements that attorney engages in unethical practices in soliciting clients); *Mangan*, 834 F. Supp. 2d at 296 (holding "Defendants' alleged statements that Plaintiff engaged in 'financial improprieties' or 'cooked the books' and mislead CSG employees into believing CSG was making a profit are statements of mixed opinion.").

The Restatement (Second) of Torts § 566 (1977) states that: "A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature it actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion."[11] It further explains:

> The second kind of expression of opinion, or the mixed type, is one which, while an opinion in form or context, is apparently based on facts regarding the plaintiff or his conduct that have not been stated by the defendant or assumed to exist by the parties to the communication. Here

---

[11] In *Lent v. Huntoon*, the Vermont Supreme Court repeatedly cited the Restatement (Second) of Torts with approval in discussing Vermont's defamation law and adopted § 595 comment d (addressing a conditional privilege based upon legitimate business interests) as "applicable in Vermont." *Lent*, 470 A.2d at 1169-70. Similarly, in *Crump*, the court cited §§ 599-606A (abuse of a conditional privilege in defamation case) with approval. *Crump v. P & C Food Markets, Inc.*, 576 A.2d 441, 446 (Vt. 1990). Although the court has not specifically adopted § 566, it would be likely to do so as § 566 dovetails with *Blouin* wherein the court found statements of pure opinion, no matter how negative, non-libelous. *See Blouin v. Anton*, 431 A.2d 489, 490-91 (Vt. 1981).

> the expression of the opinion gives rise to the inference that there are undisclosed facts that justify the forming of the opinion expressed by the defendant.

*Id.* at cmt b.

Application of the foregoing standard to the facts and circumstances in this case reveals that Coach Beaney's remaining statements suggest that he is aware of certain undisclosed and pejorative facts that would justify his opinion that Mr. Knelman had caused problems for the team in the past thus rendering the Banquet not an isolated incident. The statements themselves contain factual content which is verifiable and refer to undisclosed facts which may also be verifiable. The "not an isolated incident" comment was made in the context of defending against other players' purported concerns that Mr. Knelman had been treated too harshly under the circumstances, and suggested that such concerns were unwarranted. As the Vermont Supreme Court has observed, "where the defamatory statements are made by private individuals to private individuals, 'the First Amendment interest in protecting the defendant's speech is arguably less pressing, and the resulting accommodation might be different.'" *See Crump v. P & C Food Markets, Inc.,* 576 A.2d 441, 446 (Vt. 1990) (quoting *Ryan v. Herald Ass'n, Inc.,* 566 A.2d 1316, 1317 n.1 (Vt. 1989). Examining the statements in the light most favorable to Mr. Knelman, and drawing all reasonable inferences in his favor, the court concludes that they constitute "mixed opinions" that are not per se excluded as the basis for a defamation claim. The court thus turns to consideration of whether they are defamatory.

A communication is defamatory "if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Marcoux-Norton v. Kmart Corp.,* 907 F. Supp. 766, 778 (D. Vt. 1993) (quoting *Weisburgh v. Mahady,* 511 A.2d 304, 306 (Vt. 1986)). However, "words may be insulting, abusive, unpleasant and objectionable" without being "defamatory in and of themselves." *Blouin v. Anton,* 431 A.2d 489, 490-91 (Vt. 1981) (ruling statements that plaintiff, who was defendant's political foe, was a "horse's ass,"

33

"jerk," "idiot," and "paranoid" do not "constitute libelous statements as a matter of law."). "It is the function of the court to determine whether an expression of opinion is capable of bearing defamatory meaning because it may reasonably be understood to imply the assertion of undisclosed facts that justify the expressed opinion about the plaintiff or his conduct[.]" Restatement (Second) of Torts § 566 at cmt. c; *see also Blouin*, 431 A.2d at 491 (trial court properly ruled statements "did not constitute libelous statements as a matter of law.").

In this case, Defendants do not dispute that Middlebury's hockey team and alumni network may constitute a community for the purposes of defamation. A reasonable jury could find that Coach Beaney's statements will tend to harm Mr. Knelman's reputation in that community by suggesting he was a problem player when in fact he was not. *See Crump*, 576 A.2d at 446 (upholding a jury finding that an employer defamed the plaintiff by characterizing him as a "problem employee" when a reasonable juror could find that plaintiff's past employment record did not warrant it). Mr. Knelman has thus identified potentially "false and defamatory" statements for purposes of summary judgment.

### 2. Negligence or Greater Fault.

Where the plaintiff is not a public person, he or she is required to show that the defendant acted with negligence or greater fault in publishing the defamatory statement. *See Russin*, 2008 VT at ¶ 5, 183 Vt. at 303, 949 A.2d at 1020 (noting that the defendant must have been at least negligent in making the statement). The requirement of negligence or greater fault element is satisfied upon a finding that the statement was made with malice. *See Lent*, 470 A.2d at 1169. "The court will infer malice upon a showing that the defendant knew the statement was false or acted with reckless disregard of its truth." *Id.*

Here, Mr. Knelman points to testimony by Coach Beaney that Mr. Knelman was a "hard-working player" who was "respectful" to his coach and teammates and not a "discipline problem for the team." (Doc. 55 at ¶ 1(c).) In light of this testimony, a rational jury could find that Coach Beaney's statements that Mr. Knelman "had problems last year" and that leaving the Banquet was "not an isolated incident" were either false or

34

made with a reckless disregard of their truth. For purposes of summary judgment, Mr. Knelman has thus established an issue of fact regarding whether they were made with negligence or greater fault.

### 3. Publication to a Third Person.

In order to establish a claim of defamation, a plaintiff must establish "publication to at least one third person[.]" *Lent*, 470 A.2d at 1168. Coach Beaney's statement that the Banquet was "not an isolated incident" was made to Mr. Knelman's fellow hockey players and was thus clearly "published" to a third party.

Coach Beaney's statement that Mr. Knelman "had problems last year throughout" was made to Mr. Knelman in the course of a private conversation between the two of them. The requirement of publication is generally not met when a defendant publishes a statement directly to a plaintiff, even if the plaintiff then publishes the statement to a third party. Restatement (Second) of Torts § 577, cmt. m. Mr. Knelman nonetheless claims that he can satisfy the publication requirement because he will be compelled to self-publish the statement to future employers. Defendants counter that Vermont does not recognize the doctrine of compelled self-publication. Even if it did, they point out that if Mr. Knelman chooses to explain his dismissal from the Middlebury hockey team to future employers, there will be no need to repeat the statement in question.

Vermont has not recognized the doctrine of compelled self-publication. The judges in the District of Vermont have reached divergent opinions regarding whether the Vermont Supreme Court would adopt this doctrine. *See Raymond v. Int'l Business Machines Corp.*, 954 F. Supp. 744, 755-56 (D.Vt. 1997) (predicting that Vermont would adopt the doctrine based upon *Wilcox v. Moon*, 24 A. 244 (Vt. 1892) but noting in two other decisions, judges of this court concluded that *Crane v. Darling*, 44 A. 359 (Vt. 1899) supports a conclusion that Vermont does not and would not recognize the doctrine of compelled self-publication). The Restatement (Second) of Torts §577 rejects the doctrine, noting that, "[o]ne who communicates defamatory matter directly to the defamed person, who himself communicates it to a third party, has not published the matter to the third person if there are no other circumstances." *Id.*, at cmt. m (describing

35

"other circumstances" as including writing defamatory letter to a blind person or using a foreign language with the knowledge that a third party will likely read the letter to the person defamed).

The Second Circuit has observed that "[s]ome states have . . . expanded the publication element of a defamation claim in the employment context by adopting the doctrine of compelled self-publication defamation." *Cweklinksy v. Mobil Chem. Co.*, 364 F.3d 68, 74 (2d Cir. 2004) (citing Colorado, Iowa, Minnesota and California as states that have adopted the doctrine of compelled self-publication defamation but noting that "[c]iting a host of policy concerns, the Connecticut Supreme Court joined what it referred to as the majority of jurisdictions in rejecting compelled self-publication."); *see also Olivieri v. Rodriguez*, 122 F.3d 406, 408 (7th Cir. 1997) (noting that the doctrine of compelled self-publication is "inconsistent with the fundamental principle of mitigation of damages" and has been "largely discredited"); *DeLeon v. Saint Joseph Hosp. Inc.*, 871 F.2d 1229, 1237 (4th Cir. 1989) (refusing to adopt self-publication doctrine because "otherwise, the theory of self-publication might visit liability for defamation on every ... employer each time a job applicant is rejected.").

Those courts that have recognized the doctrine of compelled self-publication have warned that it "should be cautiously applied" and thus "limit[ ] [the doctrine] to situations in which the defamation plaintiff 'has no reasonable means of avoiding publication of the statement or avoiding the resulting damages.'" *Sherman v. Rinchem Co., Inc.*, 2011 WL 3471057, at *12 (D.Minn. Aug. 8, 2011) (quoting *Lewis v. Equitable Life Assurance Soc'y*, 389 N.W. 2d 876, 888 (Minn. 1986)).

Here, the court need not predict whether the Vermont Supreme Court would adopt the doctrine of compelled self-publication because Mr. Knelman falls far short of establishing that he will be *compelled* to repeat Coach Beaney's otherwise private statements to him to future employers. To the contrary, he may rely upon the letter provided by Mr. Quinn and may truthfully state that he was dismissed from the team for leaving the Banquet early and may further truthfully state that Coach Beaney confirmed under oath that he was a "hard-working" and "respectful" player who was not a

"discipline problem" for the team.[12]  Moreover, Mr. Knelman has not shown that Coach Beaney "knew, or should have known, that [Mr. Knelman] had no reasonable means of avoiding publication, or, in other words, that he was under strong compulsion to publish the statement." *Raymond*, 954 F. Supp. at 756.  Mr. Knelman has thus failed to satisfy the publication requirement for the statement that he "had problems last year."  This leaves only Coach Beaney's statement that leaving the Banquet was "not an isolated incident" as the basis for Mr. Knelman's defamation claim.

### 4.    Privilege.

Defendants argue that because Coach Beaney made the statement that the Banquet was "not an isolated incident" exclusively in the context of a coach discussing the qualifications of one of his team's players with the remainder of the team, he was conditionally privileged as a person "having a common interest in a particular subject matter," who given the circumstances, "reasonably . . . believe[d] that there [was] information that another sharing the common interest [was] entitled to know." Restatement (Second) of Torts § 596.  In the context of organizations, such as "religious, fraternal, charitable or other non-profit associations, whether incorporated or unincorporated," communications between members of the organization are conditionally privileged when they concern "the qualifications of the officers and members[.]" *Id.* at cmt. e.  This includes any alleged misconduct of a member that "makes him undesirable for continued membership." *Id.*; *see also Iacco v. Bohannon*, 70 Mich. App. 463, 467-68, 245 N.W.2d 791, 792-93 (1976) ("As coach of the Clare team, defendant Bohannon had a duty to criticize the actions of the players with respect to their performance as members of the team and to act in a fashion which would promote the maximum team effort.").

The Vermont Supreme Court has framed the essential elements of a defamation claim in such a way that it appears that a plaintiff must establish that a statement is not

---

[12] The fact that Mr. Knelman may have disclosed the content of Coach Beaney's statements to his employers at Geronimo Wind Energy and potential employers at Morgan Stanley does not mean that he was compelled to do so. *See Pfluger v. Southview Chevrolet Co.*, 967 F.2d 1218, 1220 (8th Cir. 1992) (applying Minnesota law and finding that the plaintiff was not compelled to self-publish allegedly defamatory statements where he voluntarily repeated them).

privileged as part of his or her case-in-chief. *Lent*, 470 A.2d at 1168 ("The general elements of a private action for defamation (libel and/or slander) are: . . . (4) lack of privilege in the publication."). In this same decision, the court refers to "privilege" as a "defense[] to "allegations of defamation" and notes that "[t]he burden of proving the privilege is on the defendants." *Id.* at 548-49 (citing Restatement § 613, 50 Am. Jur. 2d *Libel and Slander* § 451); *see also Mangan*, 834 F.Supp. 2d at 204 n.3 (noting that the New Jersey Supreme Court "has occasionally listed 'unprivileged publication' as an element of a successful defamation claim" but nonetheless treats it as one of the "affirmative defenses to be established by the defendant.") (citation omitted). Here, the court need not resolve who bears the burden of proof because the Vermont Supreme Court has unequivocally held that "a conditional privilege . . . may be overcome by a showing of malice." *Lent*, 470 A.2d at 1169. In this case, Mr. Knelman has proffered sufficient evidence of malice to render it a question of fact for the jury. Accordingly, there is presently no conditional privilege that would entitle the Defendants to summary judgment.

## 5. Special Damages.

Mr. Knelman contends that he is not required to show special damages on the grounds that the "not an isolated incident" statement was injurious to his trade, business, or occupation. Defendants respond that Mr. Knelman has not established that he is in the trade, business or occupation of hockey, only that he aspires to be.

Plaintiffs are required to show special damages in order to establish a defamation claim unless the allegedly defamatory statements constitute slander per se. *Crump*, 576 A.2d at 448. Vermont law recognizes four categories of slander per se: "(1) imputation of a crime; (2) statements injurious to one's trade, business or occupation[;] (3) charges of having a loathsome disease . . . [; or (4)] charging a woman to be unchaste." *Lent*, 470 A.2d at 1168. Special damages, when required, are pecuniary in nature and include loss of customers or business, loss of contracts, or loss of employment. *Id.; Marcoux-Norton*, 907 F. Supp. at 781.

Courts in other jurisdictions have found that statements injurious to one's trade, business, or occupation constitute slander per se even where the plaintiff was unemployed but had prior experience in the field and was seeking employment. *See Thompson v. Orange Lake Country Club, Inc.*, 224 F. Supp. 2d 1368, 1377 (M.D. Fla. 2002) (applying Florida law and finding that statements concerning an unemployed plaintiff constituted slander per se, where they denigrated the plaintiff's work abilities to prospective employers); *see also Ledbetter v. United Ins. Co. of America*, 845 F. Supp. 844, 847 (M.D. Ala. 1994) (defendant's statements to the plaintiff's former customers constituted slander per se, when they damaged the unemployed plaintiff's reputation as a debit agent).

Viewing the evidence in the light most favorable to the non-moving party, Mr. Knelman spent approximately two years playing for the USHL before attending Middlebury and he asserts that he plans to seek employment solely as a professional hockey player. The statement that leaving the Banquet was "not an isolated incident" was made to Mr. Knelman's team members in order to defend Coach Beaney's actions in dismissing him from the team. It is possible that some of these team members will either be Mr. Knelman's professional colleagues in the future, or may be asked about him by scouts and others associated with professional teams. Being a "problem player" is directly relevant to whether Mr. Knelman would be a desirable candidate for a professional hockey team. Although a close question, a rational jury could find that Coach Beaney's statement that the Banquet was "not an isolated incident," understood in the context in which it was made, reflects poorly on Mr. Knelman's ability to successfully play hockey for a professional team and comport with the team's professional standards. *See Sprewell v. NYP Holdings, Inc.*, 772 N.Y.S.2d 188, 195 (N.Y. Sup. Ct. 2003) (finding that a statement constituted libel per se, when it indicated that a professional athlete failed to report his injury from an altercation as required by the profession's rules and noting that defamatory statement "must reflect on performance" or "be incompatible with the proper conduct of [his] business"); *Smith v. IMG Worldwide, Inc.*, 437 F. Supp. 2d 297, 308 (E.D.Pa. 2006) (finding slander per se where "white

agent" told advisor of an athlete that "black agent" "played the race card" which would "cause others to question plaintiff's integrity in his business dealings with NFL clubs and would deter prospective professional football players from associating with plaintiff"); Restatement (Second) of Torts § 573 cmt. e (slander per se may be found if "the particular quality disparaged . . . is peculiarly valuable to plaintiff's business or profession."). Because a rational jury could conclude that Coach Beaney's statements were slander per se, Mr. Knelman has adduced sufficient evidence to survive summary judgment.

### 6. Actual Harm.

Even in cases of slander per se, the plaintiff bears "the burden of introducing evidence of actual harm[.]" *See Crump*, 576 A.2d at 448 (citing *Lent*, 470 A.2d at 1196). The Vermont Supreme Court has explained that "actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." *Ryan*, 566 A.2d at 1321 (quoting *Gertz*, 418 U.S. at 350). To establish actual harm, there must be "competent evidence concerning the injury," but there need not be "evidence which assigns an actual dollar value to the injury." *Id*. (quoting *Gertz*, 418 U.S. at 350). The required showing for actual damages "is typically a rather easy standard to meet." *Marcoux-Norton*, 907 F. Supp. at 81.

Mr. Knelman claims that he has suffered from a loss of standing in the community as a result of Coach Beaney's "not an isolated incident" statement, as indicated by the antagonism from teammates, such as Bryan Curran, who were originally supportive of him. In addition, he claims to have suffered from mental anguish, ultimately resulting in insomnia. These claims are sufficient to create a genuine issue of material fact. *See Cooper v. Myer*, 2007 VT 131, ¶ 9, 183 Vt. 561, 563, 944 A.2d 915, 918–19 (finding evidence that a plaintiff "suffered emotional strain, embarrassment and humiliation, and felt compelled to spend substantial time defending himself against the accusations to employees and community members . . . sufficient to put the issue [of actual harm] before

40

the jury"); *Crump*, 576 A.2d at 448 (finding the evidence sufficient when plaintiff showed that he had suffered from sleeping difficulties, loss of appetite, a temporary drinking problem, and deteriorating relationships with his children and spouse).

Because Mr. Knelman has adduced admissible evidence on each element of his defamation claim with regard to Coach Beaney's "not an isolated incident" statement, the court hereby GRANTS all other aspects of Defendants' motion for summary judgment on Mr. Knelman's defamation claim, but DENIES Defendants' motion for summary judgment insofar as it pertains to the "not an isolated incident" statement.

### F. Count VI: Negligent Supervision Against Middlebury.

Finally, Mr. Knelman brings a claim of negligent supervision against Middlebury, alleging that Coach Beaney committed tortious acts that injured Mr. Knelman and that Middlebury knew or had reason to know these acts would occur but "took no action to stop, prevent or sanction Coach Beaney." (Doc. 1 at ¶ 119.) Middlebury responds that summary judgment is appropriate because there was no underlying tortious activity. *See Haverly v. Kaytec, Inc.*, 738 A.2d 86, 91 (Vt. 1999) (holding that "the tort of negligent supervision must include as an element an underlying tort or wrongful act committed by the employee."). For purposes of summary judgment, the court has resolved this issue in Mr. Knelman's favor regarding part of his defamation claim. There is thus sufficient evidence of a "underlying tort or wrongful act" by a Middlebury employee to support a negligent supervision claim.

Middlebury next argues that it had no reason to suspect that Coach Beaney would commit any tortious act and notes that Vermont has generally adopted the definition of negligent supervision as described in the Restatement (Second) of Agency:

> A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless . . . in the employment of improper persons or instrumentalities in work involving risk of harm to others: in the supervision of the activity; or . . . in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control.

*Haverly*, 738 A.2d at 91 (quoting Restatement (Second) of Agency § 213 (1958)). Under Vermont law, an employer is liable for negligent supervision when "all the requirements of an action of tort for negligence exist," namely: (1) "the employer had a duty to forbid or prevent negligent or other tortious conduct by persons upon its premises"; (2) "the employer breached that duty"; (3) "such a breach was the proximate cause of plaintiff's injury"; and (4) "there was actual loss or damage as a result of the injury." *Id.* When determining whether an employer had a legal duty to prevent negligent or tortious conduct, the court must consider the "foreseeability of the harm" alleged by the plaintiff. *See Newbury Bible Church*, 2005 WL 1862118 at *7; *see also Oslin v. State*, 543 N.W.2d 408, 415 (Minn. Ct. App. 1996) (dismissing claim of negligent supervision where "[t]here is no evidence that [the defendant] 'knew or should have known' of any propensity by [the employee] to defame [the plaintiff.]").

As Mr. Knelman points out, under Vermont law, "[a] principal may, in addition to being found *vicariously* liable for tortious conduct of its agents, be found *directly* liable for damages resulting from negligent supervision of its agents' activities." *Brueckner v. Norwich Univ.*, 730 A.2d 1086, 1093 (Vt. 1999). Accordingly, "[o]ne who engages in an enterprise is under a duty to anticipate and to guard against the human traits of his employees which unless regulated are likely to harm others. He is likewise required to make such reasonable regulations as the size or complexity of his business may require." *Id.* (quoting Restatement (Second) of Agency § 213, cmt. g).

In this case, Mr. Knelman has adduced scant evidence that Middlebury could foresee that Coach Beaney would defame Mr. Knelman or evidence that Middlebury was otherwise negligent in supervising his activities. As he points out, however, prior to the incident in question, Middlebury had received a complaint from a student's parent regarding "several extremely negative encounters" with Coach Beaney. (Doc. 55-53 at 2.) The complaint refers to Coach Beaney as "direct," "blunt" and "disrespectful." *Id.* (internal quotations omitted). One of the student evaluations states that "Coach [Beaney] lacks respect [for] players[.]" (Doc. 55 at ¶ 24.) Examining this evidence in the light most favorable to Mr. Knelman, it provides some evidence of prior notice that would

permit Middlebury to foresee that Coach Beany may defame one of its student-athletes and that Middlebury thus had a duty to monitor his activities more closely. This evidence, albeit limited, precludes summary judgment in Middlebury's favor.

The court thus DENIES Defendants' motion for summary judgment with regard to Count VI.

## CONCLUSION

For the reasons stated above, the court hereby GRANTS Defendants' motion for summary judgment on Counts I-IV, GRANTS IN PART AND DENIES IN PART Defendants' motion for summary judgment on Count V, and DENIES Defendants' motion for summary judgment on Count VI.

SO ORDERED.

Dated at Rutland, in the District of Vermont, this _28th_ day of September, 2012.

*/s/ Christina Reiss*

Christina Reiss, Chief Judge
United States District Court